1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

CHARLES E. MOSES, JR.,

Petitioner,

vs.

DR. JEFFREY BEARD, Secretary,

Respondent.[1]

Civil No.    12cv1003-MMA (JMA)

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE
JUDGE RE:**

**(1)  DENYING MOTION TO
AMEND PETITION; and**

**(2)  DENYING PETITION FOR
A WRIT OF HABEAS CORPUS**

This Report and Recommendation is submitted to United States District Judge Michael
M. Anello pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States
District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

Charles E. Moses, Jr. (hereinafter "Petitioner"), is a state prisoner proceeding pro se and
in forma pauperis with a Petition for a Writ of Habeas Corpus by a Person in State Custody filed

---

[1] The Warden of the institution where Petitioner is confined was named as the original Respondent, but
has changed during the pendency of this action.  See www.cdcr.ca.gov (last visited Dec. 3, 2013); see also
Daniels-Hall v. Nat'l Educ. Ass'n, 629 F3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of information
posted on government website, the accuracy of which was undisputed).  Because a writ of habeas corpus acts
upon the custodian of the state prisoner, see 28 U.S.C. § 2242; Rule 2(a), 28 U.S.C. foll. § 2254, the Court sua
sponte **ORDERS** the substitution of Dr. Jeffrey Beard, Secretary of the California Department of Corrections and
Rehabilitation, as Respondent.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 894 (9th Cir. 1996) (stating that the
respondent in § 2254 proceedings may be the chief officer in charge of state penal institutions).

pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Following a bench trial, Petitioner was convicted in the San Diego County Superior Court of willful infliction of corporal injury upon a cohabitant.  (Lodgment No. 2, Clerk's Tr. ["CT"] at 109-11.)  The court made true findings on sentence enhancement allegations that Petitioner committed the offense while released from custody on an earlier offense, that he personally inflicted great bodily injury on the victim, and that he had suffered several prior convictions.  (Id.)  Following the trial, Petitioner's Marsden[2] motion was granted, and replacement counsel filed a motion for a new trial, which was denied. (CT 114-18.)  Petitioner was sentenced to 18 years in state prison.  (CT 118.)

Three claims are presented in the Petition: (1) Petitioner received ineffective assistance of trial counsel; (2) his right to due process was violated due to prosecutorial misconduct; and (3) his rights to due process and a fair trial were violated due to judicial bias.  (Pet. at 6-49.[3]) Petitioner has also filed a Motion to Supplement the Petition to add a claim alleging ineffective assistance of appellate counsel, which, for the reasons set forth below, the Court will liberally construe as a Motion to Amend the Petition.  (ECF No. 30.)

Respondent has filed an Answer to the Petition along with an incorporated Memorandum of Points and Authorities in support, and has lodged portions of the state court record.  (ECF Nos. 25-26.)  Respondent contends federal habeas relief is not available with respect to any claim presented in the Petition because the adjudication of the claims by the state court was objectively reasonable, and because the claims are without merit.  (Ans. at 11-17.)  Petitioner has filed a Traverse, in which he requests an evidentiary hearing.  (ECF No. 27.)

For the reasons set forth below, the Court finds that Petitioner is not entitled to habeas relief because the adjudication by the state court of the claims presented here did not involve an objectively unreasonable application of clearly established federal law.  The Court also finds that

---

[2] People v. Marsden, 2 Cal.3d 118, 123 (1970) (holding that a criminal defendant represented by appointed counsel or the public defender may request that the court discharge the attorney and substitute new counsel if the defendant's right to counsel would be substantially impaired by continuing with the original attorney).

[3] When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, such as the Petition, Answer and Traverse, the Court will refer to the pages assigned by that system.

1    an evidentiary hearing is unnecessary.  The Court therefore **RECOMMENDS** the Petition be

2    **DENIED** without holding an evidentiary hearing.  The Court **RECOMMENDS** that Petitioner's

3    Motion to Amend be **DENIED** on the basis that amendment would be futile, as federal habeas

4    relief is not available with respect to the ineffective assistance of appellate counsel claim.

5    **II.**

6    **STATE PROCEEDINGS**

7         On October 28, 2009, Petitioner pled guilty to one count of grand theft in violation of

8    California Penal Code section 487(a), and admitted he had suffered a prior conviction which

9    constituted a "strike" under California's Three Strikes law.  (CT 134-39.)  On December 9, 2009,

10   he was sentenced to a stipulated term of 32 months in state prison, and was scheduled to begin

11   serving his sentence on January 14, 2010.  (CT 140.)

12        On December 30, 2009, while Petitioner was released on bail and awaiting execution of

13   custody on the grand theft conviction, he was charged in a new criminal complaint which alleged

14   that on December 27, 2009, he willfully inflicted corporal injury upon a spouse or cohabitant in

15   violation of California Penal Code section 273.5(a).  (CT 1-2.)  The new complaint contained

16   sentence enhancement allegations that Petitioner personally inflicted great bodily injury on the

17   victim in violation of Penal Code section 12022.7(e); committed the offense while released from

18   custody on an earlier offense within the meaning of Penal Code section 12022.1(b); and that he

19   had nine probation denial priors within the meaning of Penal Code section 1203(e)(4), five

20   prison priors within the meaning of Penal Code sections 667.5(b) & 668, one serious felony prior

21   within the meaning of Penal Code sections 667(a), 668 & 1192.7(c), and one strike prior within

22   the meaning of Penal Code sections 667(b)-(i), 668 & 1170.12.  (CT 1-6.)  Petitioner waived his

23   right to a jury trial, and following a bench trial was found guilty of willful infliction of corporal

24   injury to a cohabitant.  (CT 111.)  The trial judge found true the allegations that the offense was

25   committed while Petitioner was released from custody on an earlier offense and that he had

26   personally inflicted great bodily injury; Petitioner admitted the truth of the prior conviction

27   allegations.  (Id.)  A new trial motion was denied, and Petitioner was sentenced to 18 years

28   imprisonment, and fines, a fee and an assessment were imposed.  (CT 114-18.)

1    Petitioner appealed, raising claims relating only to his fines, fee and assessment.

2    (Lodgment Nos. 4-6.)  The appellate court affirmed the conviction but remanded for assessment

3    of new fines and fees.  (Lodgment No. 7, People v. Moses, No. D057822 (Cal.App.Ct. June 16,

4    2011).)  Petitioner did not petition for review in the state supreme court.

5        On May 19, 2011, prior to the decision of the appellate court on direct appeal, Petitioner

6    filed a petition for a writ of mandate in the state appellate court, raising the same claims

7    presented in the federal Petition, namely, ineffective assistance of trial counsel, prosecutorial

8    misconduct, and judicial bias.  (Lodgment No. 8.)  The appellate court construed the petition as

9    a habeas petition, and, on June 15, 2011, denied relief on the on the basis that Petitioner had

10   failed to provide factual support for his claims.  (Lodgment No. 9.)  Petitioner filed a habeas

11   petition in the superior court on July 18, 2011, raising the same claims.  (Lodgment No. 10.)

12   That court denied relief on the basis that Petitioner had failed to cure the pleading defect

13   identified by the appellate court in that he had again failed to allege facts supporting his claim

14   of ineffective assistance of trial counsel.  (Lodgment No. 11.)  Petitioner filed a motion for

15   reconsideration of that order, contending that the superior court had ignored his claims alleging

16   prosecutorial misconduct and judicial bias, which was denied on the basis that Petitioner had

17   failed to provide factual support for those claims as well.  (Lodgment No. 16 at 3.)

18       Petitioner next filed a habeas petition in the state supreme court on October 14, 2011,

19   supplemented by a request for judicial notice filed on December 1, 2011, which raised those

20   same claims, as well as the ineffective assistance of appellate counsel claim he now seeks to

21   include in the Petition, and for the first time provided detailed factual allegations supporting the

22   claims.  (Lodgment Nos. 12-13.)  The state supreme court summarily denied relief on March 28,

23   2012, without citation of authority or a statement of reasoning.  (Lodgment No. 14.)

24       On December 28, 2011, while the state supreme court habeas petition was pending,

25   Petitioner filed a second habeas petition in the state superior court, alleging that the trial court

26   imposed an illegal enhancement.  (Lodgment No. 15.)  That petition was denied on February 21,

27   2012, on the basis that Petitioner knew of the claim at the time of trial and unjustifiably delayed

28   presenting it to the state court.  (Lodgment No. 16.)  On April 17, 2012, Petitioner filed a habeas

1   petition in the appellate court presenting an ineffective assistance of appellate counsel claim, and

2   a claim alleging he was denied his right of allocution at sentencing.  (Lodgment No. 17.)  That

3   petition was denied on May 22, 2012, on the basis that it was procedurally barred as untimely

4   and successive.  (Lodgment No. 18.)

### III.

### EVIDENCE ADDUCED AT TRIAL

7         At the start of his one-day bench trial, Petitioner waived his right to a jury trial on the

8   charged offense of intentional infliction of corporal injury to a spouse or cohabitant, and on the

9   sentence enhancement allegations.  (Lodgment No. 3, Reporter's Tr. ["RT"] at 9-10; CT 2.)  The

10  trial judge took judicial notice that on the date of the alleged offense, December 27, 2009,

11  Petitioner was released on bail with respect to his December 9, 2009, conviction for grand theft,

12  and was set to begin serving his 32-month sentence on January 14, 2010.  (RT 11-12.)

13        Mary Ann White-Holt testified that she began dating Petitioner in March of 2009, and as

14  of December 2009, they were planning to marry.  (RT 16.)  They began living together in April

15  or May of 2009, in a duplex, where they lived downstairs and Petitioner's brother William, his

16  wife Marla, Marla's sister Elaine, and five children lived upstairs.  (RT 17-18.)

17        On the evening of December 27, 2009, White-Holt and Petitioner engaged in a verbal

18  argument in downtown San Diego, which continued on the trolley ride home.  (RT 20-21, 52.)

19  After they returned home, the argument became mildly physical while they were in their

20  bedroom, but neither was injured, although White-Holt said Petitioner fell to the floor twice and

21  she may have scratched and pushed him.  (RT 21-23, 30.)  White-Holt said she often "tussled"

22  with Petitioner like that, but Petitioner had never hit her in her face or with his fists in any of

23  their prior arguments.  (RT 23, 68-72, 74.)  She said Petitioner had back trouble and difficulty

24  bending his arms and legs, and occasionally used a wheelchair, and she therefore had a physical

25  advantage over him and the ability to hurt him if she wished, but she denied ever wanting to hurt

26  him.  (RT 48-50.)  White-Holt admitted that she could become quite angry at times, and had hit

27  Petitioner in the past, including grabbing his neck, and that she carried a knife for her protection

28  which she had used in the past to threaten to kill him.  (RT 46-47.)

After they tussled, Petitioner left the bedroom and White-Holt received a telephone call from her daughter.  (RT 21-23.)  She went outside to talk on the telephone and saw Petitioner standing on the sidewalk in front of the house talking with some men.  (Id.)  As she was talking on the telephone on the sidewalk, someone threw a full can of beer at her, which hit her hard in the back.  (RT 21-24, 57.)  She screamed, "Who the fuck threw the beer can?", but no one spoke up.  (RT 22-23.)  She asked Petitioner if he had thrown it, but he told her no, he would not waste a full can of beer on her.  (RT 25.)

They began arguing again and Petitioner threw a plastic bottle partially filed with brandy at her, which missed, and which she picked up and drank from.  (RT 25-26, 55.)  She threw the full beer can which had hit her at Petitioner, which hit him below the shoulders.  (RT 26-27.)  White-Holt said she and Petitioner were both intoxicated, but Petitioner was more intoxicated. (RT 34, 54.)  Petitioner then left the area, White-Holt returned to their bedroom, and Elaine told her that it was Petitioner who had hit her with the full can of beer.  (RT 27, 61.)

White-Holt testified that Petitioner returned to their bedroom about half an hour later. (RT 28.)  She said they were both angry about the events that evening, and that the mood was worse for the stress surrounding Petitioner's upcoming incarceration.  (RT 28-29.)  White-Holt told Petitioner it was his fault he was going to prison and he should change his ways.  (RT 30.) Petitioner wanted to leave the bedroom, but White-Holt wanted him to stay and "get everything straight, see what was wrong, you know, what was going on."  (RT 31.)  White-Holt attempted to stop Petitioner from leaving the bedroom by putting her hand in front of him and blocking his path.  (RT 31-32.)  Petitioner told her to move but she refused.  (RT 32.)

White-Holt said she did not remember what happened next, but that the next thing she remembered was being in a daze and hearing Petitioner upstairs saying, "You all need to come down and check on that bitch.  I might have killed her."  (RT 33.)  Petitioner's brother and his wife came down, and Petitioner's brother had an angry confrontation with Petitioner.  (RT 34-35.)  Petitioner's brother and wife took White-Holt upstairs, where they helped her change her bloody clothes, and she waited there until the police and ambulance arrived.  (RT 35-36.)  She was taken to the hospital where she stayed for several days.  (RT 36-37.)

1   White-Holt said her eyes were swollen shut that night and had to be opened at the hospital
2   by cutting underneath them, and several of her teeth were loosened.  (RT 38-39.)  At the time
3   of trial, her sight was still affected, she suffered headaches, had lost a tooth, and had follow-up
4   appointments scheduled with a plastic surgeon and an eye doctor.  (RT 40-43.)  She said
5   Petitioner had never hit her with his fists before, but he had in the past told her that he had quick
6   hands and could knock her out quickly with his hands, like he had once knocked someone else
7   out.  (RT 74-76.)

8       Homayoun Nabizadeh, a City of San Diego Police Officer, testified that he was in
9   uniform on patrol driving a marked police car at 9:15 p.m. on December 27, 2009, when he saw
10  Petitioner staggering in the street, jaywalking, attempting to get the officer's attention.  (RT 81-
11  82.)  Petitioner told Officer Nabizadeh that "he just beat up his wife."  (RT 83.)  Petitioner's eyes
12  were bloodshot, his knuckles were swollen and cut, he was bloodstained, smelled of alcohol, and
13  appeared heavily intoxicated.  (RT 83, 99.)  Another officer waited with Petitioner while Officer
14  Nabizadeh responded to the address provided by Petitioner.  (RT 84.)

15      When Officer Nabizadeh arrived at the residence, he observed White-Holt being escorted
16  down a flight of stairs; her eyes were closed and swollen, she was bleeding from her right eye
17  and mouth, and he immediately called the paramedics.  (RT 85.)  White-Holt told the officer that
18  Petitioner "got angry and punched her."  (RT 86.)  Later that evening at the hospital, White-Holt
19  gave a statement consistent with her trial testimony, with the exception that she told Officer
20  Nabizadeh that she was on the bed when she told Petitioner he needed to change his ways, and
21  that Petitioner then "jumps on the bed, on top of her, and starts punching away at her.  And then
22  for some reason, he stops.  That's when, you know, the family members come in, and he leaves
23  the house."  (RT 87-88.)  Officer Nabizadeh said he took a knife from Petitioner that night, but
24  could not recall if Petitioner had surrendered it or it was taken during a pat-down, and could not
25  recall if Petitioner said it belonged to White-Holt.  (RT 108-09.)

26      Christopher Pavle, a City of San Diego Police Officer, testified that he detained Petitioner
27  while Officer Nabizadeh investigated.  (RT 102-03.)  Officer Pavle gathered evidence from the
28  scene, including bloody clothing from a trash can in the upstairs unit, but failed to locate the beer

can used in the assault or any additional witnesses.  (RT 103-06.)  Sedonia Weathersby, a City of San Diego Police Officer, testified that she contacted White-Holt in the hospital about twenty-four hours after the assault, and observed that her eyes were almost closed, her front teeth were very loose, and that she was bruised and angry.  (RT 114.)  Officer Weathersby testified that additional photographs were taken of the victim eleven days after the incident at the prosecutor's request, which were admitted into evidence.  (RT 115-19.)

Jay Joseph Doucet, an associate clinical professor of surgery at the University of California San Diego Medical Center, testified that he treated White-Holt the morning after she sustained her injuries.  (RT 125-26.)  White-Holt had bruising and contusions along both eyelids and both sides of her face, a cut on her gum, a ridge fracture of the bone just above her teeth, a hematoma behind her left eye, a contusion of a retina, swelling of her right ear, blood coming from her right nostril, and loose teeth, all due to blunt trauma consistent with impact by a closed fist, although he noted she had loose teeth to begin with.  (RT 128-31, 134.)  The trial on the prior conviction allegations was bifurcated, and the People rested.  (RT 138.)

Petitioner was the only defense witness called, and he testified that he and White-Holt had been together for about a year, that they had a "very beautiful" relationship, and were planning on marrying.  (RT 140.)  He said White-Holt often grabbed him by the throat and slapped him, although he never hit back.  (RT 141.)  She once threatened to kill him on a bus with a knife she carried in her purse when he declined to accompany her on an errand, as a result of her being jealous, as she thought if he left him alone he would become involved with someone else.  (RT 141-42.)  Petitioner was five-feet, seven-inches tall and weighed 194 pounds, and White-Holt was five-feet, four-inches tall and weighed 165 pounds, but due to his physical disabilities she was able to subdue him when they wrestled and she could beat him up.  (RT 74, 140, 143.)  He said his arms and legs do not bend, and it is hard for him to maneuver, as a result of a five-month coma he was in due to pneumonia in 1990.  (RT 143.)

Petitioner said that earlier on the evening of the incident they got into an argument downtown, which was renewed on the trolley ride home when Petitioner spoke to another woman.  (RT 144-45.)  Petitioner had been drinking at that point but White-Holt had not.  (RT

145.)  Petitioner said he was not upset, but that White-Holt, as was her custom, refused to stop talking about their dispute.  (Id.)  They went to their bedroom where Petitioner poured brandy into a plastic bottle for her, and then told her he was going to go outside to have a beer.  (RT 146.)   White-Holt threatened to go to her granddaughter's house if Petitioner left.   (Id.) Petitioner then went outside to have a beer with some people who were standing around, but who he "really couldn't see" because it was so dark.  (RT 147.)  Petitioner saw White-Holt walk out, and when he turned to go back inside, he heard her say that someone had hit her with a beer. (Id.)  He did not see who threw the beer at her.  (Id.)  She grabbed him by his collar and asked if he had thrown the beer.  (Id.)  Petitioner told her, "I didn't hit you with no beer.  I wouldn't waste no beer like that."  (Id.)  Petitioner turned to go inside and White-Holt threw the beer can at him and hit him in the arm.  (RT 148.)  He denied throwing the plastic bottle partially filled with brandy, or anything else, at White-Holt.  (Id.)

Petitioner was lying on the bed when White-Holt entered their bedroom and criticized him for allowing someone to throw a bottle at her.  (Id.)  Petitioner got up and said he was leaving, at which point White-Holt blocked the door and grabbed Petitioner by the throat.  (RT 148-49.)  Petitioner asked if he could go to the bathroom, at which point White-Holt "scratched the shit out of me, all down my neck."  (RT 150.)  Petitioner testified that "I must have blacked out, because when I came to, she was getting up off the ground, saying 'wait until I get up.'" (RT 150-51.)  He saw that her knife and telephone were on the bed within her reach, and he "knew she was probably going to kill me."  (RT 150-51, 172.)  Petitioner stood up and hit her twice with an open hand, which broke his thumb.  (RT 150.)  He said he is not able to bend his arms in a manner which would allow him to punch with a closed fist, but when asked why his knuckles were swollen and cut, he said "I don't know."  (RT 166-67, 172-73.)  He grabbed the knife and phone and went upstairs to get his brother.  (RT 150.)  When asked how many times he thought he hit White-Holt in total, he said "probably three."  (RT 152.)

Petitioner testified that he left the residence and flagged down a police officer because he was concerned for White-Holt's welfare, and that he placed her telephone and knife on the ground at the officer's feet and told him, "me and my wife just got into a fight."  (RT 152-53,

173.)  Petitioner denied ever being angry or upset that night, denied being stressed out about going to jail, stated that he just wanted to get away from White-Holt's continued fussing and arguing, and said that if he had not hit her so severely she would have chased him down.  (RT 159-60, 163.)

The defense rested and there was no rebuttal.  (RT 173.)  The attorneys presented closing argument, with Petitioner's trial counsel focusing on self-defense, in particular the amount of force used, arguing that two or three hits was reasonable to disable an opponent who had a physical advantage and access to a knife which she had admitted using to threaten to kill him with in the past.  (RT 174-79.)  The trial judge found Petitioner guilty, stating:

> I find beyond a reasonable doubt that the defendant has committed the offense as charged and the allegations that are attendant to the charge are true.
>
> In particular, in regard to the issue of self-defense, I don't think the belief that there was imminent danger of violence, based on all of the facts and circumstances that have come out of the evidence, is reasonable.
>
> Additionally, I think there was an excessive amount of force.  And I don't -- and for those reasons, I don't believe that the right of self-defense would apply in this case.
>
> And I've considered all of these circumstances and facts in the testimony, including listening to the witnesses and judging the credibility of their stories as well.

(RT 180.)

Petitioner then admitted the truth of the prior conviction allegations.  (RT 181-83.)  At the time scheduled for sentencing, the trial judge noted that he had received numerous letters from Petitioner complaining of the quality of representation from his trial counsel, a public defender, and requesting appointment of new counsel to look into whether trial counsel provided sufficient representation.  (RT 187-88.)  In those letters, Petitioner complained that his trial counsel failed to: (1) object when the prosecutor badgered him on the stand and mocked and misstated his testimony; (2) photograph Petitioner's injuries; (3) meet with Petitioner to hear his version of the events until a week before the bench trial, which counsel had insisted upon; (4) investigate White-Holt's criminal record or her inconsistent versions of what happened that evening; (5) introduce letters she had written to Petitioner; (6) call any witnesses, including a

doctor to testify that it is possible to be rendered unconscious by neck trauma and to testify regarding the extent of Petitioner's disabilities; and (7) adequately prepare for the sentencing hearing.  (CT 35-28, 60-70; Pet. Ex. N-1.)  The trial judge granted the <u>Marsden</u> motion and appointed the alternate public defender to determine whether Petitioner received effective assistance of trial counsel.  (RT 188.)

A new trial motion was filed by the appointed alternate public defender, who contended that trial counsel was ineffective for failing to: (1) employ an investigator to investigate the case; (2) employ medical experts who could have corroborated Petitioner's testimony that he passed out when he was grabbed by the throat by the victim, and that his physical disabilities prevented him from assaulting the victim in the way she claimed; (3) impeach the victim with her prior convictions for disorderly conduct in 2004 and shoplifting in 1981 and 1982, as well as with her arrests for assault with a deadly weapon in 1995 and fraud in 1990; and (4) consult with the defendant adequately regarding his defense.  (CT 74-79.)  The People filed an opposition to the new trial motion (CT 81-90), supported by the affidavit of Petitioner's trial counsel, who stated:

> I have completed over a [sic] 100 jury trials and 50 bench trials during my career.

> I have handled thousands of cases during my career as a defense attorney.  The cases I have dealt with has [sic] involved a wide variety of crimes, consisting of both simple and very complex issues.

> I have been employed as a deputy public defender at the San Diego Public Defender's Office since 1988.  At that office, I have supervised and helped train several attorneys.

> I, being the assigned attorney to Mr. Moses, thoroughly evaluated his case.  After careful consideration and evaluation of the facts and circumstances, I did not believe further investigation was needed.

> *If* I had decided to employ an investigator for this case, it would have been to interview the gentlemen who were standing outside the house during the beer throwing incident.  I asked Mr. Moses about the people's identities, but he stated he did not know them or where they resided.

> Regarding the failure to employ medical experts to corroborate Mr. Moses' testimony, I did not believe hiring such experts would have contributed to his defense. Mr. Moses admitted he *did* strike her and explained *how* he did it.  There was no evidence that Ms. Holt received additional injuries from someone or something else, so this expert testimony does not seem relevant.  Further, it his [sic] extremely unlikely a medical expert would have been able to testify to the fact that Mr. Moses did in fact pass out during the assault.

I did not feel as if I needed to impeach the victim, Ms. Holt. Ms. Holt's story was consistent with Mr. Moses' self-defense claim. It was my intention to have the court *believe* Ms. Holt. Therefore, I did not want to discredit her. This was a logical strategy choice that I believed would serve to benefit the defendant.

While this case was pending, I met with Mr. Moses on at least three occasions to discuss the trial and possible strategies to employ.

(CT 88-89) (italics in original).

The trial judge denied the new trial motion on the basis that trial counsel "did more than an adequate job representing" Petitioner, that counsel's conduct was "within the range of reasonable assistance," and because, "I don't think the proceedings would have been different, had he chosen other tactics." (RT 198.) Petitioner was sentenced to six years on the corporal injury count, four years on the great bodily injury enhancement, two years for committing the offense while released from custody, five years for the serious felony prior, and one year for the prison priors, for a total sentence of 18 years imprisonment. (RT 201.)

## IV.

## PETITIONER'S CLAIMS

(1)     Petitioner received ineffective assistance of counsel because his trial counsel failed to conduct a reasonable pre-trial investigation, acted under a conflict of interest, coerced Petitioner into waiving his right to a jury trial, and committed numerous instances of deficient performance. (Pet. at 6-33.)

(2)     Petitioner's Fourteenth Amendment right to due process was violated due to numerous instances of prosecutorial misconduct. (Pet. at 34-41.)

(3)     Petitioner's Fourteenth Amendment right to due process was violated due to judicial bias. (Pet. at 42-49.)

(4)     Petitioner received ineffective assistance of appellate counsel because counsel refused to raise on direct appeal the claims presented here, and refused to raise a claim alleging the trial transcripts had been altered.[4]  (Mot. to Amend Pet. [ECF No. 30-1] at 6-15.)

/ / /

/ / /

---

[4]  Claim 4 is presented in Petitioner's Motion to Amend the Petition.

# V.

## DISCUSSION

For the following reasons, the Court finds that the adjudication by the state court of the claims raised in the Petition did not involve an objectively unreasonable application of clearly established federal law.  The Court also finds that an evidentiary hearing is unnecessary because Petitioner's claims can be adequately addressed based on the current state of the record.  The Court therefore **RECOMMENDS** the Petition be **DENIED**.  The Court also finds that amendment of the Petition to include the proposed ineffective assistance of appellate counsel claim would be futile because the claim does not merit habeas relief, and **RECOMMENDS** Petitioner's Motion to Amend the Petition be **DENIED**.

**A.     Standard of Review**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably

applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407.  A decision may also involve an unreasonable application "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u>

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . ." <u>Williams</u>, 529 U.S. at 412.  In order to satisfy section 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

**B.    Claim 1 - Ineffective Assistance of Trial Counsel**

Petitioner alleges in his first claim that he received ineffective assistance of trial counsel because his trial counsel was preparing to go to trial in another case while representing Petitioner and did not have time to conduct an adequate pre-trial investigation, which also amounted to a conflict of interest and led to counsel coercing Petitioner into waiving his right to a jury trial. (Pet. at 6.)  Petitioner alleges that his trial counsel's performance was deficient in that counsel: (a) said he was going to send an investigator to photograph the bruise on Petitioner's arm where he was hit with a full can of beer thrown by White-Holt, but failed to do so; (b) failed to investigate White-Holt's injuries or bring to the court's attention Petitioner's broken thumb, which would have shown that White-Holt's injuries were consistent with Petitioner's version of how he hit her; (c) misstated facts during closing argument by saying that Petitioner struck White-Holt three times rather than twice; (d) failed to present evidence regarding White-Holt's prior arrest for assault with a deadly weapon, or a letter she wrote to Petitioner stating that she was angry with him that night for speaking to another woman on the trolley; (e) failed to investigate whether it is possible for someone to be rendered unconscious due to trauma to the

neck, including failing to ask the prosecution's expert medical witness to opine on that subject and refusing to call as a witness Dr. Granger from the George Bailey Detention Facility who told Petitioner it was possible to be rendered unconscious by neck trauma; (f) failed to introduce Petitioner's medical records or call his doctor to testify regarding the severity of his disability; (g) came to see Petitioner at the detention facility "for the first and only time to sit down and actually discuss my side of the incident seven days" prior to the start of trial, and therefore represented Petitioner at the readiness hearing and the preliminary hearing without "knowing the defendant's version of what happened that evening," leaving Petitioner effectively unrepresented at those proceedings; (h) failed to object to introduction by the prosecutor of photographs of the victim taken eleven days after the incident, which were introduced as a result of a discovery violation, and conducted no investigation regarding what may or may not have happened to the victim during those eleven days; (i) failed to investigate or cross-examine White-Holt regarding a statement she made to the police and later repudiated that Petitioner jumped on top of her in the bed and punched her several times; (j) failed to investigate or question White-Holt about Petitioner's contention that "her street name was Razor Mary" because she always carried a knife, or that she suffered from paranoia, schizophrenia and "delusional jealousy"; (k) failed to object at the preliminary hearing when White-Holt said Petitioner threw "another" bottle at her, when the evidence was that only one can and one bottle had been thrown at her; and (l) failed to present mitigating evidence that Petitioner was acting under the evolutionary "fight or flight syndrome." (Pet. at 7-33; Traverse at 13-17.) Petitioner also alleges that an actual conflict of interest was essentially conceded when his Marsden motion was granted and the alternate public defender was appointed to replace trial counsel, and that the appointed alternate public defender met with Petitioner only once, did not file a motion for a mistrial as requested, and failed to subject Petitioner's prior convictions to adequate adversarial testing. (Pet. at 28-29.)

Respondent answers that the state courts cited and applied the applicable clearly established federal law and there is no reason to permit Petitioner to relitigate his claims in federal court. (Ans. at 13.) Respondent also contends that Petitioner's ineffective assistance of

counsel claim is without merit because: (a) the record is devoid of evidence that Petitioner was coerced into a bench trial; (b) the record shows Petitioner's trial counsel represented him to the best of his abilities given that Petitioner had admitted he punched White-Holt in the face several times with both hands while she was unarmed and getting up off the floor, and counsel was therefore constrained in his ability to present a defense of self-defense by the facts of the case and Petitioner's admissions; (c) counsel made a reasonable tactical decision not to impeach White-Holt with her criminal record and her letter to Petitioner because her testimony in large part supported Petitioner's claim of self-defense, and because she admitted on the stand that she had written the letter apologizing to him, and had admitted that she had grabbed him, scratched him a number of times, threw a can of beer at him, and told him she would stab him with a knife; and (d) there was no reason to employ a medical expert to testify that Petitioner could have lost consciousness as a result of the pain inflicted by White-Holt on his neck because it was extremely unlikely that a medical expert would testify that Petitioner did in fact lose consciousness.  (Ans. at 14.)

Claim 1 was presented to the state supreme court in a habeas petition filed on October 14, 2011, in the same manner it is presented in the federal Petition here.  (Lodgment No. 12 at 3-8.) That petition was summarily denied on March 28, 2012, without citation of authority or a statement of reasoning.  (Lodgment No. 14.)  Petitioner had previously presented an ineffective assistance of trial counsel claim in a petition for a writ of mandate filed in the state appellate court on May 19, 2011, but did not support the claim with factual allegations or exhibits as he has done here and in the state supreme court.  (Lodgment No. 8.)  The appellate court construed the petition for a writ of mandate as a habeas petition, and denied relief on the on the basis that Petitioner had failed to provide factual support for his claims.  (Lodgment No. 9.)  Petitioner filed a habeas petition in the superior court several days later raising the same claims, but once again failed to provide sufficient factual support.  (Lodgment No. 10.)  The superior court denied relief, noting that Petitioner had failed to cure the pleading defect identified by the appellate court in that he had failed to allege facts supporting his claims.  (Lodgment Nos. 11, 16.)

The silent denial by a state supreme court is presumed to be a denial on the merits.

1    <u>Harrington v. Richter</u>, 562 U.S. ___, 131 S.Ct. 770, 785 (2011).  "The presumption may be

2    overcome when there is reason to think some other explanation for the state court's decision is

3    more likely."  <u>Id.</u>  In this case, Petitioner's ineffective assistance of trial counsel claim was

4    presented to the state supreme court in a very different manner than it was presented to the lower

5    state courts.  Petitioner did not support his claim with factual allegations in the lower courts, and

6    the claim was denied on the basis that it was unsupported by factual allegations.  When he

7    presented the claim to the state supreme court, it was supported by detailed factual allegations

8    as it is here.  Accordingly, the Court will apply the <u>Richter</u> presumption that the state supreme

9    court denied Petitioner's ineffective assistance of counsel claim on the merits rather than on the

10   basis given by the lower court, that it was not sufficiently supported by factual allegations.  <u>See</u>

11   <u>id.</u> ("When a federal claim has been presented to a state court and the state court has denied

12   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

13   of any indication or state-law procedural principles to the contrary."); <u>see also</u> <u>Harris v. Superior</u>

14   <u>Court</u>, 500 F.2d 1124, 1127-28 (9th Cir. 1974) (finding that because the California courts each

15   have original jurisdiction over habeas corpus petitions, a denial by the state supreme court which

16   is not accompanied by citation of authority or a statement of reasoning should be treated as an

17   adjudication on the merits for purposes of exhaustion rather than an adoption of a lower court's

18   procedural bar).

19        When reviewing a silent denial of a claim by the California Supreme Court, a federal

20   habeas petitioner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by

21   showing that 'there was no reasonable basis' for the California Supreme Court's decision."

22   <u>Cullen v. Pinholster</u>, 563 U.S. ___, 131 S.Ct. 1388, 1402 (2011), quoting <u>Richter</u>, 131 S.Ct. at

23   784.  "Under § 2254(d), a habeas court must determine what arguments or theories . . . could

24   have supported the state court's decision; and then it must ask whether it is possible fairminded

25   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

26   decision of this Court."  <u>Richter</u>, 131 S.Ct. at 786; <u>Pinholster</u>, 131 S.Ct. at 1402 ("Section

27   2254(d) applies even where there has been a summary denial."), citing <u>Richter</u>, 131 S.Ct. at 786.

28        "As a condition for obtaining habeas corpus from a federal court, a state prisoner must

show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 131 S.Ct. at 786-87.  The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." <u>Id.</u> at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things.  First, he must show that counsel's performance was deficient. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u>  Second, he must show counsel's deficient performance prejudiced the defense. <u>Id.</u>  This requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u>  To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. <u>Id.</u> at 694.  A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>  Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. <u>Id.</u> at 687.

"A lawyer who fails to adequately investigate, and to introduce into evidence, records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." <u>Hart v. Gomez</u>, 174 F.3d 1067, 1070 (9th Cir. 1999); <u>see also</u> <u>Strickland</u>, 466 U.S. at 690-91 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")  A decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgments." <u>Strickland</u>, 466 U.S. at 691.

"Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. __, 130 S.Ct. 1473, 1485 (2010). "The standards created by <u>Strickland</u> and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." <u>Richter</u>, 131 S.Ct. at 788 (citations omitted). These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." <u>Pinholster</u>, 131 S.Ct. at 1398. Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction. <u>Richter</u>, 131 S.Ct. at 786, quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 332 n.5 (1979). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." <u>Strickland</u>, 466 U.S. at 687.

Petitioner first alleges that his trial counsel said he was going to send an investigator to photograph the bruise on Petitioner's arm where he was hit with a full can of beer thrown by White-Holt, but failed to do so. (Pet. at 7; Traverse at 32.) Both White-Holt and Petitioner testified at trial that she threw a full beer can at Petitioner and that it hit him. (RT 26, 148.) In light of that undisputed testimony, and the "heavy measure of deference" courts must give to counsel's judgments, it would have been reasonable for the state court to find that counsel's decision not to document the bruise Petitioner received as a result of being hit by the beer can was not an error "so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687. The state supreme court may also have reasonably found that even if counsel's failure to document the bruise was not a tactical decision, the error did not prejudice Petitioner because, in light of the undisputed testimony that he was hit with the can, the absence at trial of photographic evidence that he was hit by the can did not "undermine confidence in the outcome" of his trial. <u>Id.</u> at 694.

Petitioner contends he testified that he hit White-Holt only twice, but his trial counsel misstated the number of times he hit her during closing argument. (Pet. at 8-9; Traverse at 32.) Petitioner points to counsel's statement in closing argument that, "He admits he hit her. How many times he hit her - - I think the doctor said it's consistent with three times, the two times

when she went down on the ground and the third time when she was trying to get up." (RT 179.) Petitioner testified that White-Holt had grabbed him by the neck, and that when she scratched his neck "it seems like the lights went out. And when I came to, she was trying to get off the ground." (RT 151.) He testified that when he regained consciousness, White-Holt was on the ground trying to get up, saying "wait until I get up," which Petitioner took as a threat, and then he hit her "again" to "make sure she didn't get up and kill me." (RT 152.) When asked on direct examination how many times he hit her in total, he said, "Probably three." (Id.) On cross-examination, Petitioner similarly testified that, "She was getting up. So I hit her two more times, bam, bam, like that." (RT 162.) A reasonable interpretation of Petitioner's own testimony was that he hit White-Holt three times. His trial counsel therefore did not misstate the number of times Petitioner hit her. The state supreme court could have reasonably rejected this contention on the basis that it was unsupported by the record, or could have reasonably found that it was sound trial strategy for counsel to refrain from arguing that Petitioner hit the victim only twice, as that could have been seen as a distortion of the evidence and may have diminished the credibility of counsel's closing argument.

Petitioner alleges counsel failed to investigate White-Holt's injuries and failed to bring to the court's attention that he broke his thumb hitting her, which would have shown that White-Holt's injuries were consistent with Petitioner's version of how he hit her (two blows with an open hand, not with a closed fist), thereby supporting his claim of self-defense. (Pet. at 7-8; Traverse at 16, 32.) The doctor who treated White-Holt did not testify that she was hit with a closed fist, merely that it was "possible" that her injuries could have been caused by a closed fist, and that her injuries were consistent with as few as three blows. (RT 131, 135.) Petitioner testified that he broke his thumb when he hit White-Holt open-handed (RT 150), and that he was unable to hit with a closed fist due to his disabilities (RT 172-72), so the trial judge was aware of his claims in that regard. Although Petitioner contends he told trial counsel that his knuckles had been deformed several years before he met the victim (Pet. at 21), at trial he tried to explain how he might have cut his knuckles when he hit White-Holt open-handed, but eventually said "who knows" what caused his knuckles to be swollen, and answered, "I don't know," when

asked "how do you explain the swollen, cut knuckles you had?"  (RT 166-67.)

The trial judge was also aware of the nature and severity of White-Holt's injuries through her description of them and her testimony that she was in the hospital for several days, as well as through the testimony of her treating doctor and the two officer witnesses who testified regarding her appearance.  The doctor who treated her the next day said she was struck hard enough to cause a ridge fracture in the bone above her teeth, which is a "pretty dense" part of the skull, and that there was a worry about a possible loss of vision due to the contusion of her retina.  (RT 129-30.)  It is therefore clear that Petitioner's claim of self-defense did not turn on whether he hit White-Holt open-handed or with a closed fist, but, as indicated by the trial judge, by insufficient evidence of imminent danger and the amount of force used as reflected in the severity of her injuries.  (RT 180.)  Petitioner's testimony that he was unable to explain why his knuckles were cut and swollen, and was unable to say how White-Holt ended up on the floor as a result of Petitioner "probably" hitting her as he lost or was losing consciousness, along with evidence of his severe intoxication, prevents him from being in a position to say for certain how he hit her.  The medical records he submits in support of his contention that he was physically incapable of hitting with a closed fist (Pet. Ex. V), which he says sat unused on counsel's table during the trial (Traverse at 17), do not establish an inability to hit with a closed fist.  Rather, Petitioner merely speculates that a medical expert might have been found to support his testimony that his disability prevented him from hitting with a closed fist.  Speculative and conclusory allegations are insufficient to prove that counsel provided ineffective assistance. Blackledge v. Allison, 431 U.S. 63, 74 (1977); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994); see also Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (speculation that counsel could have retained an expert does not establish prejudice where there was no evidence that an expert would testify favorably to petitioner).  Thus, the state court could reasonably have found that Petitioner's trial counsel did not err with respect to investigating White-Holt's injuries or in presenting Petitioner's version of how she was injured.

Furthermore, even assuming medical evidence or expert testimony could have been introduced to support Petitioner's contention that he could not hit with a closed fist, whether

Petitioner struck White-Holt with an open hand or a closed fist was never relevant to his claim of self-defense, and even if it was, it was overshadowed to the point of irrelevance by the severity of the injuries he inflicted upon her.  See People v. Minifie, 13 Cal.4th 1055, 1064-65 (1996) (holding that to support a claim of self-defense, the threat of bodily injury must be imminent, and "any right of self-defense is limited to the use of such force as is reasonable under the circumstances.")  The state court could have reasonably found that any error in failing to investigate White-Holt's injuries to show they were consistent with being hit open-handed did not "undermine confidence in the outcome" of the trial.  Strickland, 466 U.S. at 687-94.

Petitioner contends trial counsel failed to call Petitioner's doctor to testify regarding the severity of his disabilities, and failed to introduce his medical records.  (Pet. at 13-14; Traverse at 17.)  Both Petitioner and White-Holt testified regarding Petitioner's disabilities, and there was no dispute that they rendered him vulnerable to, and at a physical disadvantage with, White-Holt. As set forth above, Petitioner merely speculates that an expert could be found to testify that he is incapable of hitting with a closed fist.  He contends that a competent counsel would have put together a defense based on a disabled man afraid of being attacked by someone who has a physical advantage over him, has attacked him before, and has threatened his life with a knife in the past.  (Pet. at 13-14.)  That was in fact the defense which was presented at trial, and the nature and extent of Petitioner's physical disabilities were undisputed.

Even if Petitioner is correct that a reasonable person could find that he used reasonable force in the face of a reasonable belief that he was in imminent danger, the state court's opposite conclusion is still entitled to deference as long as it, too, is objectively reasonable.  Renico v. Lett, 559 U.S. 766, 777-78 (2010).  It would have been objectively reasonable for the state court to find that trial counsel's decision not to hire a medical expert to testify regarding a subject that was not contested at trial (the extent to which Petitioner was vulnerable as a result of his disability), was not an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," or that it "so undermined the proper functioning of the adversarial process that the defendant was denied a fair trial."  Strickland, 466 U.S. at 687.  Petitioner contends that if medical evidence of his disabilities had been admitted,

the trial judge might never have found that Petitioner did not have a reasonable belief he was in imminent danger.  However, the state supreme court could have found that the evidence regarding the severity of White-Holt's potentially permanent injuries, and the fact that she was hit so hard that Petitioner broke his thumb and broke a dense bone in her skull, indicated that excessive force was used, defeating his claim of self-defense irrespective of whether he believed he was in imminent danger.  Id.; Minifie, 13 Cal.4th at 1064-65.

Petitioner next contends his trial counsel failed to present evidence regarding White-Holt's arrest for assault with a deadly weapon in 1995, about fifteen years before Petitioner's trial. (Pet. at 9-11; Traverse at 32.)  White-Holt, who first met Petitioner about one year before trial, admitted that she had a physical advantage over Petitioner and the ability to hurt him if she wanted to, admitted that she had a history of becoming quite angry at times, and admitted that she had hit Petitioner in the past, including grabbing his neck and threatening in public to kill him with her knife.  (RT 46-50.)  Trial counsel indicated that it was a tactical choice not to impeach White-Holt because he wanted the trial judge to believe her when she testified that she had used her physical advantage to prevent Petitioner from leaving the bedroom, and to have the judge believe her testimony that she was capable of great anger, capable of beating up and hurting Petitioner, and had in the past grabbed his neck and threatened to kill him with her knife. Her credibility in that respect was an important part of Petitioner's self-defense claim, because it provided a basis for arguing that when she said "wait until I get up," it caused in him a concern for his own safety, and supported his testimony that he believed he needed to hit her to make his escape and prevent her from attacking him with her knife.  Evidence that White-Holt had been arrested fifteen years earlier for, but not convicted of, assault with a deadly weapon, would have added little to her own admission at trial that she had in fact assaulted Petitioner with a deadly weapon sometime during the past year.  In addition, the trial judge was aware of White-Holt's entire criminal history when he denied the new trial motion, and observed that the outcome would have been the same had counsel chosen other tactics. (RT 198.)  Trial counsel's decision not to attack White-Holt's credibility fell within the "wide latitude counsel must have in making tactical decisions." Strickland, 466 U.S. at 689.  The state court could reasonably have found

1    that even if counsel's decision was not tactical, the failure to impeach White-Holt with evidence

2    that she had been arrested fifteen years earlier for assault with a deadly weapon, when she had

3    admitted at trial she had assaulted Petitioner with a deadly weapon within the past year, did not

4    "undermine confidence in the outcome" of Petitioner's trial.  Id. at 694.

5          Petitioner contends that trial counsel failed to introduce a letter White-Holt wrote to

6    Petitioner stating that she was angry with him that night for speaking to another woman on the

7    trolley.  (Pet. at 9-11.)  When White-Holt was asked at trial what had happened on the trolley

8    that evening that made her so angry, she explained that their argument had started before they

9    got on the trolley, and that it was exacerbated by another incident which happened after the

10   alleged incident where Petitioner supposedly spoke to another woman on the trolley.  (RT 52.)

11   She did not exactly deny at trial that she was upset with Petitioner for flirting with a woman on

12   the trolley, she merely stated that, "I didn't say anything to him about him flirting with anybody

13   or anything like that."  (Id.)  The prosecutor asked White-Holt if she had maintained contact with

14   Petitioner after the incident, and she testified that they had written each other constantly and both

15   said in their letters they were sorry.  (RT 19-20.)  Even if the letters contained an admission that

16   White-Holt became upset on the trolley ride home because Petitioner spoke to another woman,

17   it would not have directly impeached her trial testimony that she did not say anything to him

18   about it on the trolley, and it would have added little if anything to her trial testimony that she

19   was angry and upset with Petitioner for the entire series of events that evening.  The state court

20   could reasonably have found that her admission in her letter had little or no impeachment value,

21   and that it was not error for trial counsel to fail to present it at trial.  Strickland, 466 U.S. at 687.

22   The state court could also have reasonably found that even if counsel's decision was not tactical,

23   White-Holt's admission in the letter was cumulative to the evidence that she was angry and upset

24   with Petitioner that night for other reasons, and therefore the failure to admit the letter into

25   evidence did not "undermine confidence in the outcome" of the trial.  Id. at 694.

26        Petitioner contends trial counsel failed to investigate the fact that it is possible to be

27   rendered unconscious due to trauma to the neck, and failed to ask the prosecution's medical

28   witness to opine on that subject.  (Pet. at 11-13; Traverse at 32.)  He contends that Dr. Granger

from the George Bailey Detention Facility told Petitioner it was possible to be rendered unconscious due to neck trauma, but counsel did not call him because counsel believed he would not be a credible witness. (Id.) Trial counsel explained in his post-trial affidavit that such an expert would not contribute to the defense because Petitioner testified that he hit the victim and testified as to why he hit her, and that in any case it was unlikely a medical expert would have testified that Petitioner did in fact pass out. (CT 89.) The trial testimony of both Petitioner and White-Holt is unclear exactly what happened at the moment Petitioner first hit White-Holt, but Petitioner's testimony suggests he hit her once while she had her hands on his neck, causing her to release him and for her to fall to the floor, and then struck her twice more as she was getting up off the floor. (RT 151-52, 162, 179.) In light of White-Holt's own admission at trial that she grabbed Petitioner's neck and physically prevented him from leaving the bedroom, and her uncontested testimony that she had a physical advantage over him and was able to beat him up, evidence that it was medically possible for him to have passed out from being grabbed around the neck, or evidence that he actually passed out, would have provided little, if any, support for his contention that he needed to hit her twice more after he regained consciousness in order to make his escape. The state supreme court could reasonably have found that trial counsel's decision not to introduce medical testimony regarding whether it is possible for someone to pass out from neck trauma was not an error so serious as to deprive Petitioner of a fair trial. Strickland, 466 U.S. at 687.

Petitioner contends counsel came to see him "for the first and only time to sit down and actually discuss my side of the incident seven days" prior to the start of trial, and counsel therefore represented Petitioner at the readiness hearing and the preliminary hearing without "knowing the defendant's version of what happened that evening," leaving Petitioner effectively unrepresented at those proceedings. (Pet. at 15-17; Traverse at 26-27.) Trial counsel stated in his post-trial declaration that, "While this case was pending, I met with Mr. Moses on at least three occasions to discuss the trial and possible strategies to employ." (CT 89.) Petitioner contends that his efforts to procure the visitation logs where he was confined at the time were thwarted, and that he could use those logs to show counsel visited him only once. (Pet. at 15.)

However, Petitioner admits that he also met with counsel prior to the readiness hearing, when counsel told Petitioner the prosecution was offering a plea deal for eight years and recommended they go to trial instead. (Id. at 31; Traverse at 32.)

Although Petitioner indicates that counsel was unable to adequately represent him at the readiness hearing or the preliminary hearing because he had not yet heard Petitioner's side of the story, he does not indicate what counsel should have done differently at either hearing, with two exceptions. He contends trial counsel failed to object at the preliminary hearing when White-Holt said Petitioner threw "another" bottle at her, when the evidence was that only one can and one bottle had been thrown at her. (Pet. at 20.) Taken in context it appears this was merely an inadvertent reference to two items, the can and bottle, being thrown at her, not two bottles. (Lodgment No. 1, Preliminary Hearing Tr. at 8, 25, 32.) Defense counsel in fact argued at the end of that hearing that White-Holt had not testified she had been hit with a bottle, merely that Petitioner had thrown one at her, and the preliminary hearing judge responded by saying that the testimony regarding the bottle was not clear, that it had changed and was fluid, and was in any case not pertinent to the ruling. (Id. at 49.) The state court could have reasonably found that this minor failure to correct the record at the preliminary hearing was not a serious error and did not result in prejudice. Strickland, 466 U.S. at 687-94.

Petitioner also argues that the preliminary hearing judge had no factual basis upon which to make the finding that Petitioner was not in imminent fear of immediate injury, because Petitioner's side of the story was not presented at the preliminary hearing. (Pet. at 23; Pet. Ex. V.) The only witnesses who testified at the preliminary hearing were White-Holt and Officer Nabizadeh, who were called by the prosecution and cross-examined by defense counsel. (Lodgment No. 1, Preliminary Hearing Tr. at 1-47.) Although the defense did not call any witnesses or introduce any evidence, after the prosecution rested, defense counsel stated:

> Obviously, your Honor, there is a lot of factual issues here that are going to have to be discussed in front of a jury. Only issue I think - - I mean, there is an issue of self-defense and others. But great bodily injury, I'm not sure if that has been shown. I ask the court to dismiss that allegation.

(Id. at 47.) The preliminary hearing judge then rejected a self-defense claim based on the

evidence presented at the hearing, with the understanding that facts regarding self-defense might be developed at trial.  (Id. at 48-49.)  Thus, the record suggests that Petitioner's trial counsel was aware of the self-defense claim, but chose not to present it at the preliminary hearing.  It is also clear from the trial testimony that the only way to establish Petitioner's self-defense claim was to have Petitioner testify as to his subjective belief in the need to protect himself.  Although Petitioner has "a fundamental constitutional right to present affirmative defenses" at the preliminary hearing, Jennings v. Superior Court, 66 Cal.2d 867, 874-76 (1967), the state court could reasonably have found that Petitioner had not overcome the strong presumption that trial counsel had a tactical reason for not presenting evidence of self-defense at the preliminary hearing, and instead saving for trial Petitioner's contention that he hit White-Holt only to save his life.  See California Criminal Law Practice and Procedure, 2012 Ed., § 8.13 (noting that although a defendant has an absolute right to testify at the preliminary hearing, it is unusual for a defendant to testify or to put on a defense at the preliminary hearing because it would provide the prosecution with discovery.)  The state court could also have reasonably rejected Petitioner's contention that the same evidence which the trial judge relied upon to find him guilty would have led the preliminary hearing judge to dismiss the charges had it been presented.

Petitioner alleges that counsel had not heard his side of the story when counsel advised him to reject the eight-year plea offer at the readiness conference, and that he was not given the opportunity to accept or deny the offer because counsel immediately left after telling Petitioner they were going to go to trial instead of accepting the offer.  (Pet. at 31; Mot. to Amend Pet. [ECF No. 30-1] at 11; Traverse at 32.)  Petitioner has maintained throughout the state court proceedings, as he does here, that he is the victim of an assault by White-Holt, and that the prosecutor brought unwarranted charges against him.  (Pet. at 34; Pet. Ex. N-1.)  In light of his lack of an indication, here or in the state court, that he would have accepted an eight-year plea bargain for a crime he has always maintained he did not commit and did not occur, and in light of his contention, both here and in the state court, that he would not have been convicted but for a total breakdown in the adversarial process, it would have been reasonable for the state supreme court to find that he has not shown prejudice arising from his counsel's conduct in relation to the

1  plea offer.  See Lafler v. Cooper, 566 U.S. ___, 132 S.Ct. 1376, 1384 (2012) (holding that the

2  two-part Strickland test applies to claims of ineffective assistance of counsel during plea-

3  bargaining, and in order to establish prejudice, "a defendant must show the outcome of the plea

4  process would have been different with competent advice.")

5          Petitioner alleges his trial counsel failed to object to the introduction by the prosecutor

6  of photographs of the victim taken eleven to thirteen days after the incident, because a report

7  prepared by Officer Weathersby regarding the photographs had not been disclosed to the defense

8  through discovery, and because counsel conducted no investigation regarding what may or may

9  not have happened to the victim during that time.  (Pet. at 17-18; Traverse at 17, 33.)  Officer

10  Weathersby testified that photographs were taken of the victim eleven days after the incident at

11  the prosecutor's request.  (RT 115-19.)  Defense counsel indicated that he did not have a copy

12  of a portion of Weathersby's report she submitted to the district attorney (RT 119), but there is

13  no indication in the record that the photographs were not produced prior to trial.  In fact, a

14  photograph of White-Holt taken about a week and a half after the incident was introduced into

15  evidence at the preliminary hearing.  (Lodgment No. 1, Preliminary Hearing Tr. at 20.)  Thus,

16  Petitioner has not demonstrated that the photographs were withheld from the defense by the

17  prosecution, and has failed to show how or why he was prejudiced by a delay in obtaining a

18  portion of Weathersby's report regarding the taking of the photographs.

19          Petitioner contends he was prejudiced by the introduction into evidence of the

20  photographs because the doctor who treated White-Holt the day after she was injured testified

21  that her injures were of the type that would heal in a week or so, yet the photographs showed she

22  had not yet recovered nearly two weeks after she was injured.  (Pet. at 19; Traverse at 18.)  The

23  doctor testified at trial that many of White-Holt's injuries were serious, and could eventually

24  lead to a loss of vision (RT 131), but that "the other injuries, the contusions and whatnot, we

25  expected those would all go away eventually."  (RT 132.)  White-Holt's appearance eleven days

26  after the incident did not mislead the trial judge regarding her injuries because the doctor who

27  treated her the day after the incident testified regarding the extent of her injuries (RT 125), the

28  responding police officer testified regarding her appearance several minutes after the incident

(RT 85), and another police officer testified regarding the injuries as she observed them less than twenty-four hours after they were inflicted.  (RT 114.)  Petitioner has shown no prejudice as a result of counsel's failure to object to the introduction of photographs which the trial judge knew were taken eleven days after the incident (RT 115-19), and which, as discussed below in Claim 2, were not introduced as a result of a discovery violation.

Petitioner contends trial counsel failed to investigate or cross-examine White-Holt regarding a statement she made to the police and later repudiated that Petitioner had jumped on top of her in their bed and punched her several times.  (Pet. at 19, 21.)  Petitioner contends that trial counsel's error in failing to point out that White-Holt's statement was false, and in allowing the introduction of the photographs taken of her injuries eleven days after the incident, "were the root of my conviction."  (Pet. at 19.)  When White-Holt was asked at trial what had happened after Petitioner got upset when she refused to allow him to leave the bedroom, she stated, "Oh, to tell you the truth, I can't remember.  Only thing I remember - - oh, wow, I don't remember."  (RT 32.)  When asked if Petitioner had hit her, she testified that, "I guess he did.  Because I don't remember."  (RT 33.)  Officer Nabizadeh testified that White-Holt told him that night that Petitioner "got angry and punched her," and that he jumped "on the bed, on top of her, and starts punching away at her.  And then for some reason, he stops.  That's when, you know, the family members come in, and he leaves the house."  (RT 87-88.)

Petitioner has not explained how additional investigation or cross-examination of White-Holt with respect to her inconsistent statements would have helped his case.  To the extent he contends counsel could have shown that her statements to the police were false by pointing out that she had changed her story, it is more likely that her original statements were true and her trial testimony false.  See e.g. People v. Brown, 33 Cal.4th 892, 899 (2004) (discussing reasons for frequent recantation by victims of domestic violence).  Because her trial testimony was much more conducive to the self-defense claim than her police statements, it appears defense counsel may have had a strong tactical reason for not inquiring into why she was unable to remember at trial what had happened yet was able to tell the police that night that Petitioner had punched her in anger.  See id. ("[A] victim who reports an abusive family member to police may later

-29-

protect the person by denying, minimizing, or recanting the report.")  Even if there was some tactical advantage to impeaching White-Holt with her prior inconsistent statements, such a strategy would likely have been unavailing in light of her testimony that she was sorry for what had happened and still loved Petitioner.  Id.  Thus, the state court could reasonably have found that counsel made a reasonable tactical decision not to impeach White-Holt with her statements to the police, either to avoid calling attention to her recantation, or for the reasons given in counsel's post-trial declaration, that he wanted the trial judge to believe her trial testimony.

Petitioner contends counsel failed to investigate or question White-Holt that "her street name was Razor Mary" because she always carried a knife, which would have supported his contention that he needed to hit her in order to protect himself from a person ready, willing and able to attack him with a knife.  (Pet. at 20.)  As discussed above, White-Holt testified that she often carried a knife and had used it to threaten Petitioner's life in public.  There is no indication that evidence she had a reputation for behavior she admitted to at trial would have bolstered the self-defense claim.  Petitioner also contends he told counsel that White-Holt suffered from paranoia, that she was diagnosed as a paranoid schizophrenic, which is characterized by delusional jealousy, and that she had not been taking her medication that evening, but that counsel did not bring these things to the judge's attention.  (Pet. at 32-33; Traverse at 17.)  The state court could have reasonably determined that White-Holt's own admissions at trial regarding her propensity to get angry and to get violent with Petitioner when she gets angry, her admission that she was in fact angry that night and had hit and grabbed Petitioner in anger that night as she had done during their previous arguments, and had threatened to kill him in public, along with her uncontested physical advantage over Petitioner, was sufficient evidence of the danger she presented to Petitioner to evaluate the level of force, if any, Petitioner needed to use to protect himself, so as to render evidence of her mental health status unnecessary or cumulative.  See Richter, 131 S.Ct. at 788 (the "standards created by Strickland and section 2254(d) are both highly deferential and when the two apply in tandem," review is doubly deferential); Pinholster, 121 S.Ct. at 1398 (the Strickland and AEDPA standards are "difficult to meet" and "demand that state court decision be given the benefit of the doubt.")

1    Petitioner contends counsel failed to present mitigating evidence that he was acting under

2    the evolutionary "fight or flight syndrome." (Pet. at 24-28; Traverse at 33.) The state court

3    could have reasonably found that such evidence would not have assisted the trial judge in

4    determining whether Petitioner was in imminent danger from White-Holt or whether he had used

5    a reasonable amount of force.

6    Petitioner alleges that his trial counsel, "brought me before a women [sic] judge that I'm

7    not familiar with and told [sic] if I went to trial in front of this woman I wouldn't stand a chance.

8    But there's a man judge I know that would be more so in my favor. This is how the court

9    appointed attorney coerced me into a bench trial with Judge Kenneth K. So. Not knowing its

10   [sic] the jury who makes the decision not the judge I became fearful about having my trial in

11   front of a women [sic] judge this being the first time I ever thought about going to trial." (Pet.

12   at 31; Traverse at 16.) The state court could have reasonably found that there was no evidence

13   that Petitioner was coerced into giving up his right to a jury trial by accepting counsel's advice

14   to proceed to a bench trial in front of a judge with whom counsel believed the self-defense claim

15   would stand a better chance. Petitioner has not overcome the strong presumption that counsel's

16   advice in this regard can be considered sound trial strategy. Strickland, 466 U.S. at 689 ("There

17   are countless ways to provide effective assistance in any given case. Even the best criminal

18   defense attorneys would not defend a particular client in the same way.")

19   Petitioner alleges that his trial counsel was acting under a conflict of interest. (Pet. at 6,

20   28.) A criminal defendant is entitled under the Sixth Amendment to representation free from

21   conflicts of interest. Wood v. Georgia, 450 U.S. 261, 271 (1981). In order to demonstrate a

22   conflict of interest which rises to the level of a federal constitutional violation, Petitioner must

23   show that his trial counsel actively represented conflicting interests and the conflict adversely

24   affected counsel's performance. Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).

25   Petitioner's allegation that his assigned public defender was too busy to give his case the

26   proper amount of attention because he was preparing to go to trial in another matter with another

27   client while he was representing Petitioner (Pet. at 6), does not satisfy this standard. Neither has

28   Petitioner alleged that counsel's performance was adversely affected in any way by that alleged

conflict.  Petitioner contends that the granting of his <u>Marsden</u> motion shows that a conflict of interest existed.  (Pet. at 28.)  The <u>Marsden</u> motion was not granted on the basis of a conflict of interest, but as a result of Petitioner's complaints that his trial counsel failed to object when the prosecutor badgered Petitioner and mocked and made fun of his testimony, and when his defense attorney failed to call witnesses, present medical testimony, photograph his injuries, investigate or impeach the victim, and failed to visit Petitioner before trial to discuss strategy or after trial to discuss sentencing issues.  (RT 187-88; CT 60-70.)  The state court could reasonably have found that Petitioner had presented no evidence that his trial counsel actively represented conflicting interests or that any alleged conflict adversely affected counsel's performance. <u>Cuyler</u>, 446 U.S. at 350.

Petitioner contends that his appointed alternate public defender met with him only once, did not file a motion for a mistrial as Petitioner requested, and failed to point out that because Petitioner's prior strike conviction was not considered a strike at the time he was convicted, its use to enhance his sentence violated ex post facto principles.  (Pet. at 28-29.)  Petitioner does not explain why he was prejudiced when his appointed alternate public defender filed a motion for a new trial rather than a motion for a mistrial.  Petitioner's contention that it is a violation of ex post facto principles to use a prior conviction as a strike when the conviction was not a strike when it was committed, is erroneous as a matter of law.  <u>See</u> <u>Gryger v. Burke</u>, 334 U.S. 728, 732 (1948) ("The sentence as a fourth offender or habitual criminal is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes.  It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one."); <u>Russell v. Gregorie</u>, 124 F.3d 1079, 1088-89 (9th Cir. 1997) ("It is hornbook law that no *ex post facto* problem occurs when the legislature creates a new offense that includes a prior conviction as an element of the offense, as long as the other relevant conduct took place after the law was passed.")

The Court finds that Petitioner has not identified errors by his trial counsel which, either individually or cumulatively,  "so undermined the proper functioning of the adversarial process that the defendant was denied a fair trial."  <u>Strickland</u>, 466 U.S. at 687.  Although Petitioner

requests an evidentiary hearing, one is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief. <u>Campbell v. Wood</u>, 18 F.3d 662, 679 (9th Cir. 1994). Accordingly, the Court **RECOMMENDS** denying habeas relief with respect to Claim 1 on the basis that the silent denial of the claim by the state supreme court involved an objectively reasonable application of clearly established federal law. <u>Richter</u>, 131 S.Ct. at 788; <u>Pinholster</u>, 121 S.Ct. at 1398; <u>Strickland</u>, 466 U.S. at 687-94.

## C.    Claim 2 - Prosecutorial Misconduct

Petitioner alleges in Claim 2 that his federal constitutional right to due process was violated due to prosecutorial misconduct. (Pet. at 35.) Specifically, he alleges the prosecutor: (a) failed to disclose to the defense the photographs taken of the victim eleven to thirteen days after the incident in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."); (b) presented false testimony, and failed to correct testimony the prosecutor knew to be false, by arguing that Petitioner left the premises immediately after hitting the victim; (c) improperly mischaracterized evidence during closing argument by stating that White-Holt had testified that Petitioner was outside in the driveway drinking beer with friends when there was no such testimony, by stating that Petitioner had to lean over to punch the victim while she was on the ground, and by arguing that Petitioner "snapped" and "pummeled" the victim, which also constituted slander; (d) personally vouched for the victim's honesty by arguing that her version of the events was more believable that Petitioner's version, and that Petitioner had a bigger motivation to lie; (e) falsified statements in the People's response to the motion for a new trial; and (f) brought charges against Petitioner for which the prosecutor knew there was insufficient support. (Pet. at 34-41[5]; Traverse at 18-19.)   Respondent answers that Petitioner has not shown that the prosecutor's actions amounted to misconduct or resulted in prejudice. (Ans. at 15-16.)

---

[5] Page 35 was omitted from the Petition and is not part of the Court record.

-33-

12cv1003

Claim 2 was presented to the state supreme court in a habeas petition in the same manner as Claim 1, and denied without citation of authority or a statement of reasoning. (Lodgment 12 at 9-13; Lodgment No. 14.)  For the reasons set forth above, the Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  <u>Richter</u>, 131 S.Ct. at 786; <u>Pinholster</u>, 131 S.Ct. at 1402.

Clearly established federal law provides that "[t]o constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987), quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985).  The alleged misconduct must be reviewed in the context of the entire trial.  <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).

Petitioner contends the prosecutor presented false testimony, and failed to correct testimony the prosecutor knew to be false, in several respects during closing argument.  (Pet. at 36-42.)  The prosecutor gave a brief closing argument, and stated in full:

> Your Honor, it seems as if we have a relationship here that seemed to have a turbulent past.  Yes, they argued quite a bit.  But when we focus on this date, they were arguing all day, pretty much, going downtown.  And they headed back to the home, arguing about food, whatever the arguments were on the trolley.
>
> And things were just tense to begin with.  The defendant was facing incarceration the next couple months.  The victim testified how he was fairly tense about that.
>
> Then we have this incident where the defendant is outside, hanging out with some people in front of the residence.  And Miss White-Holt walks out.  She's talking to her daughter on the phone, and she gets hit by a beer can.  And that sort of sparks another thing on this already kind of tense day.
>
> She confronts, "Hey, who the fuck hit me with a beer can?"
>
> The defendant adamantly denies.  Whatever.  She throws the beer can back at him at some point, and she goes in the bedroom.  It's after some period of time, about 20, 30 minutes, she's inside the bedroom.  Yeah, she's still a little heated about what happened outside.  And the defendant comes in, and they again sort of resume their argument.
>
> It seems what happens is, during this argument, she's talking about his incarceration, saying, "Hey, it's your fault.  You need to change your ways."

And in the midst of all of this, the defendant sort of snaps. He can't take it anymore. He can't take the fact that she wants to talk about it more.

He snaps and pretty much unloads on her. Looking at the injuries depicted in court's Exhibit 1, basically pummels her, causes both her eyes to swell up within a matter of a few minutes, causes a fairly significant fracture to her mouth, a cut, some swelling to her ear, some of her teeth to be, I guess, loosened some more that they already were.

And what does the defendant do? [¶] He takes off. He takes off and kind of staggers down the street. He'd been drinking significantly. [¶] The officer talks about what his high level of intoxication is. [¶] And he makes a statement to the officer, just candidly, "Look, I just beat up my wife."

Not, "I was protecting myself," "I accidentally did this," "I don't know what really happened," "It was just a big milieu."

"I just beat up my wife."

And from that investigation, that's when Miss White-Holt was discovered and seen with all the significant injuries. [¶] I think the defendant's testimony, as he's testified, is completely incredible.

He wants to tell the court that the officer is lying, saying, "No, I didn't say I beat up my wife. I didn't say that at all."

And the fact of the observations of his cut and swollen knuckles - - "well, maybe I got it" - - "This is how I really hit it, by hitting the top part of my fist, but maybe I could have gotten them otherwise." [¶] Or maybe those observations were totally incorrect by the officer.

And then, obviously, his testimony that he blacked out at the most, you know, convenient time is - - just for a matter of seconds, where he blacks out and sees the victim on the ground - - okay.

His testimony is, "Well, I had to hit her in self-defense. I don't know if I hit her then, but she was just on the ground, and I was scared for my life."

And instead of - - I don't know - - taking the phone and the knife that he testifies to - - we've heard no other testimony - - that he says that was on the bed - - instead of just grabbing those things and leaving, he said, "Well, I thought she was going to grab them. So I had to lean over and punch her," while she was on the ground, not attacking him, while she was on the ground.

"I had to punch her twice, and then I could leave. And then I could take the knife and the phone."

I think, if Mr. Moses wants to get a proper self-defense claim, its certainly not by the scenario that he described in this situation.

He obviously used way more force than was reasonably necessary, even assuming his set of facts, which we heard only from him. He has the biggest motivation in this case to lie than say what happened.

///

-35-

1   I think what really happened is what we heard from Miss White-Holt. Yes,
    some of her testimony she admitted, saying, "I don't remember," or "I am kind of
2   mixed up."

3       But I think, by considering her demeanor on the stand, her being
    completely upset, especially when shown the photos, her expressed still love for
4   the defendant, how she still cares about him, how she still writes them - - writes
    him - - and he's written her - - I think her demeanor on the stand, taken in
5   conjunction with all the evidence we heard in this case, that from officer
    Nabizadeh, officer Pavle and the detective, all the evidence that was found at the
6   scene, the immense amount of blood on the sweatshirt, the defendant's
    admissions, all of that, I do believe this is enough evidence to convict the
7   defendant beyond a reasonable doubt.

8   (RT 174-78.)

9       Petitioner's contention that the prosecutor misstated the evidence when she said he left

10  the premises immediately after hitting the victim (Pet. at 40), is simply wrong, because the

11  prosecutor did not say Petitioner left without going upstairs, and did not say he left immediately.

12  The same is true regarding Petitioner's contention that the prosecutor falsely stated that White-

13  Holt testified that Petitioner was outside in the driveway drinking beer with friends (Pet. at 36),

14  as the prosecutor made no such statement, but stated that Petitioner was outside in front of the

15  residence hanging out with some people.

16      Petitioner contends the prosecutor misstated the evidence by stating that Petitioner had

17  to lean over to punch White-Holt while she was on the ground, and that he "snapped" and

18  "pummeled" her. (Pet. at 37-39.) Petitioner testified that he "must have blacked out," and when

19  he regained consciousness he looked over and saw White-Holt getting up off the ground, and

20  he knew if she got up she would probably kill him, so he hit her twice more, and probably hit

21  her three times in all. (RT 150-52.)  White-Holt testified that she did not remember what

22  happened when Petitioner hit her, but the next thing she remembered was being in a daze and

23  hearing Petitioner upstairs saying, "You all need to come down and check on that bitch.  I might

24  have killed her." (RT 33.) Officer Nabizadeh testified that White-Holt told him that Petitioner

25  "got angry and punched her," and that she was on the bed when he jumped on top of her and

26  "starts punching away at her." (RT 86, 88.)  The prosecutor's closing argument that Petitioner

27  "snapped" and "pummeled" White-Holt was therefore a proper comment on the trial testimony,

28  particularly in light of the evidence regarding the nature and severity of White-Holt's injuries,

and the fact that neither party testified to the exact circumstances regarding the initial hit by Petitioner.  See United States v. Tucker, 641 F.3d 1110, 1120-21 (9th Cir. 2011) ("Prosecutors can argue reasonable inferences based on the record, and have considerable leeway to strike hard blows based on the evidence and all reasonable inferences from the evidence.")

Petitioner contends the prosecutor personally vouched for the victim's honesty by arguing that the victim's version of the events was more believable than Petitioner's version, and that Petitioner had a bigger motivation to lie.  (Pet. at 38.)  The prosecutor's argument was proper.  See Tucker, 641 F.3d at 1120-21 ("A prosecutor may express doubt about the veracity of a witness's testimony (and) may even go so far as to label a defendant's testimony a fabrication."); see also United States v. McChristian, 47 F.3d 1499, 1506 (9th Cir. 1995) (holding that in order to prove a claim of improper vouching, petitioner must show that the prosecutor placed "the prestige of the government" behind the witness by personally assuring the witness' veracity).

Petitioner contends the prosecutor falsified statements in the People's response to the motion for a new trial by stating that Petitioner was outside with friends drinking in the driveway.  (Pet. at 34, Pet. Exs. 2-3.)  However, Petitioner testified at trial that he went outside to get a beer with some people standing outside, and answered "Yeah" when asked at trial if he "actually went outside to get a beer?"  (RT 146-47.)  Thus, the prosecutor's summarization of the evidence in the People's response to the new trial motion did not falsify evidence or amount to an improper comment on the evidence in that regard.  The same is true with respect to Petitioner's contention that the prosecutor falsely stated in opposition to the new trial motion that White-Holt said Petitioner was upset about his upcoming incarceration and that he got angry and punched her several times in the face (Pet. Exs. 2, 5; RT 29, 152), that both the victim's eyes were swollen shut (Pet. Exs. 2, 6; RT 37), and that Petitioner denied telling the police officer that he had just beat up his wife and could not really explain why his knuckles were bloody.  (Pet. Exs. 2, 9; RT 83, 165-67.)

Petitioner contends the prosecutor misstated evidence when she stated in the opposition to the new trial motion that Petitioner threw an empty beer bottle at White-Holt.  (Pet. at 34; Pet. Ex. 2, 4; CT 82.)  This appears to be a reference to White-Holt's testimony that Petitioner threw

a plastic bottle partially filled with brandy at her.  (RT 26.)  Petitioner does not indicate how such a minor misstatement in a summarization of the evidence in a post-trial motion filed before the same trial judge who had heard all the evidence could possibly be "of sufficient significance to constitute a due process violation."  Greer, 483 U.S. at 765.  The same is true of his contention that the prosecutor stated that Petitioner "had been drinking quite a lot that day and the victim had not."  (Pet. Exs. 2, 7-8.)  The testimony at trial was that Petitioner had been drinking a lot that day and the victim much less.  (RT 34, 54-55.)  Even if the statement could be read as Petitioner contends, that the victim had not been drinking at all, as opposed to the more reasonable interpretation that the victim had not been drinking as much as Petitioner, there is no showing that such characterization of the evidence in a new trial motion violated due process. Greer, 483 U.S. at 765.

Petitioner contends the prosecutor brought charges which the prosecutor knew had insufficient factual and legal support, because Petitioner had reported the incident to the police, because neither he nor White-Holt had pressed charges, and because Petitioner was in fact the victim of an assault by White-Holt and hit her only in self-defense.  (Pet. at 34.)  The state court could reasonably have rejected this contention as legally and factually frivolous.

Finally, Petitioner contends the prosecutor failed to disclose through discovery the photographs taken of the victim eleven to thirteen days after the incident, and that the failure to disclose the photographs before trial amounted to a violation of Brady.  (Pet. at 34-36.)  Officer Weathersby testified that additional photographs were taken of the victim eleven days after the incident at the prosecutor's request.  (RT 115-19.)  Defense counsel indicated that he did not have a copy of a portion of Weathersby's report she submitted to the district attorney (RT 119), but there is no indication in the record that the photographs were not produced prior to trial.  In fact, a photograph of White-Holt taken about a week and a half after the incident was introduced into evidence at the preliminary hearing.  (Lodgment No. 1, Preliminary Hearing Tr. at 20.) Petitioner has not demonstrated that the photographs were withheld from the defense.

Furthermore, Petitioner can demonstrate materiality under Brady only if the suppression of the evidence deprived him of a fair trial.  Bagley, 473 U.S. at 678; see Kyles v. Whitley, 514

1   U.S. 419, 434 (1995) (holding that prejudice under <u>Brady</u> is shown when "there is a reasonable

2   probability of a different result" as to guilt or penalty.)  Several witnesses testified regarding the

3   extent of White-Holt's injuries, including White-Holt herself, her treating doctor, and two officer

4   witnesses.  Petitioner agues that the doctor who treated White-Holt the day after she was injured

5   testified that her injures were of the type that would heal in a week or so, and he was prejudiced

6   by photographs taken nearly two weeks after she was injured because they showed she had not

7   yet recovered.  (Traverse at 18.)  However, the doctor testified at trial that many of White-Holt's

8   injuries were serious, and could eventually lead to a loss of vision (RT 131), but that "the other

9   injuries, the contusions and whatnot, we expected those would all go away eventually."  (RT

10   132.)  The state court could reasonably have found that Petitioner had failed to allege facts

11   sufficient to support a <u>Brady</u> claim or a claim of prosecutorial misconduct with respect to the

12   photographs.

13        Furthermore, assuming, *arguendo*, that Petitioner could demonstrate that the state court

14   adjudication of his prosecutorial misconduct claim is objectively unreasonable within the

15   meaning of 28 U.S.C. § 2254(d), federal habeas relief is only available if he can also establish

16   that his federal constitutional rights were violated.  <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-22

17   (2007) (holding that a federal habeas petitioner must show a constitutional violation even if

18   § 2254(d) has been satisfied); <u>Frantz v. Hazey</u>, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc)

19   (same).  For the reasons set forth above, Petitioner has not alleged facts which, if true, establish

20   prosecutorial misconduct.  An evidentiary hearing is not necessary where, as here, the federal

21   claim can be denied on the basis of the state court record, and where the petitioner's allegations,

22   even if true, do not provide a basis for habeas relief.  <u>Campbell</u>, 18 F.3d at 679.

23        Accordingly, the Court finds that the silent denial of Claim 2 by the state court was

24   neither contrary to, nor involved an unreasonable application of, clearly established federal law,

25   and was not based on an unreasonable determination of the facts in light of the evidence

26   presented in the state court proceedings.  The Court also finds that an evidentiary hearing is not

27   necessary to the resolution of Petitioner's prosecutorial misconduct claim.  The Court therefore

28   **RECOMMENDS** denying habeas relief as to Claim 2.

**D.      Claim 3 - Judicial Bias**

Petitioner alleges in Claim 3 that he was denied his federal constitutional rights to due process and a fair trial due to judicial bias.  (Pet. at 42.)  He contends judicial bias has been shown because the trial judge: (a) found Petitioner guilty when the evidence established that he acted in self-defense using no more force than was necessary; (b) did not ask if Petitioner wished to speak on his own behalf prior to sentencing; (c) denied him access to jail visitation records necessary to show how often trial counsel visited him; (d) found him guilty on the basis of photographs taken of the victim eleven to thirteen days after the incident; (e) did not inquire into the conflict of interest of trial counsel and did not safeguard Petitioner's right to the effective assistance of trial counsel; (f) failed to apply the law of self-defense; (g) denied the motion for a new trial; and (h) allowed the prosecutor to make misstatements and withhold photographs of the victim.  (Pet. at 42-49; Traverse at 19-22.)

Respondent answers that Petitioner has failed to point to anything the trial judge did that suggests he was biased, because a judge's judicial rulings can almost never support a finding of judicial bias.  (Ans. at 16-17.)  Respondent also contends that because a criminal defendant does not have a constitutional right to a preliminary hearing, Petitioner's claim that the trial judge bound him over for trial without sufficient evidence does not state a federal claim.  (Id.)

Petitioner presented this claim to the state supreme court in the habeas petition which contained Claims 1 and 2.  (Lodgment No. 12 at 14-15.)  The petition was denied without citation or statement of reasoning. (Lodgment No. 14.)  For the reasons set forth above, in order to determine whether the silent denial of this claim by the state supreme court involved an objectively reasonable application of clearly established federal law, the Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  Richter, 131 S.Ct. at 786; Pinholster, 131 S.Ct. at 1402.

Clearly established federal law provides that, "when a defendant's right to have his case tried by an impartial judge is compromised, there is structural error that requires automatic

reversal." <u>Greenway v. Schriro</u>, 653 F.3d 790, 805 (9th Cir. 2011), citing <u>Tumey v. Ohio</u>, 273 U.S. 510, 535 (1927). The Supreme Court has recognized that "the right to an impartial judge [is] among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'" <u>Greenway</u>, 653 F.3d at 805, quoting <u>Chapman v. California</u>, 386 U.S. 18, 23 (1967).

"A showing of judicial bias requires facts sufficient to create actual impropriety or an appearance of impropriety." <u>Greenway</u>, 653 F.3d at 806. These include "circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" <u>Caperton v. A.T. Massey Coal Co., Inc.</u>, 556 U.S. 868, 877 (2009), quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975). "The supreme court has recognized only a few circumstances in which an appearance of bias necessitates recusal to ensure due process of law," including pecuniary interest, where the judge acted as both the grand jury and the trier of fact, where the defendant rudely insulted the judge who then presided over contempt proceedings, and where a party was a large donor to the judge's election campaign. <u>Greenway</u>, 653 F.3d at 806-07.

Petitioner has not alleged facts which support a finding that his trial judge was biased. Rather, he relies on many of the same instances which he contends resulted in him having an unfair trial, all of which are without merit for the reasons set forth above. (Pet. at 42-49.) The only allegation not already addressed in Claims 1 and 2 is the allegation that the trial judge did not ask Petitioner if he wished to speak on his own behalf prior to sentencing.

Just prior to announcing sentence, the trial judge asked whether either side would like to make any further argument. (RT 200.) Petitioner's counsel argued against a finding of great bodily injury, and the prosecutor submitted without argument. (<u>Id.</u>) Petitioner was not asked if he wished to say anything prior to pronouncement of sentence, although the trial judge stated that he had reviewed the correspondence Petitioner had sent the trial judge. (RT 187, 201.) Petitioner sent the trial judge ten letters after trial and before sentencing in which he pointed out that: (1) he was not the aggressor in the encounter with White-Holt and had tried several times that night to avoid any confrontation, and the confrontation would have been avoided had she

allowed him to leave; (2) he had never struck her before that night even though she had often hurt him, and he was merely protecting himself and acting in self-defense; (3) he immediately summoned help from his brother and the police, and surrendered her knife to the police: (4) the deputy district attorney had distorted those facts; (5) his trial counsel had provided incompetent representation in many of the respects discussed in Claim 1 above; (6) he was a good candidate to be granted probation, and had been accepted into a drug and alcohol rehabilitation program; (7) his prior convictions were nonviolent, minor, and attributable to a long history of substance abuse; (8) he was remorseful, disabled, and capable of putting his life in order and living the rest of his life as a kind-hearted, sober, law-abiding citizen; and (9) he had been victimized by an unjust legal system due to inadequate representation and a trial judge who had ignored the evidence of self-defense, and that his written complaints to that effect had gone unheeded by the ACLU, the NAACP, the San Diego Union Tribune, the San Quentin Law Office, the San Diego Mayor, the Turko Files, the Americans with Disabilities Act, the California Bar Association, the California Governor, and the President of the United States.  (CT 35-38, 60-73; Pet. Ex. N-1; Traverse Ex. J; Mot. to Amend Pet. Ex. G.)

Petitioner has not indicated what else he had to say to the trial judge, how it would have affected his sentencing, or why the trial judge's failure to ask Petitioner if he had anything additional to say amounted to judicial bias.  Because the record reflects that the trial judge read and considered Petitioner's letters, the state court could reasonably have found that no evidence existed to support Petitioner's claim of judicial bias.  To the extent Petitioner intended to bring an independent claim alleging denial of his right of allocution, it is clear that in light of the fact that the trial judge reviewed Petitioner's lengthy and detailed correspondence, and in light of Petitioner's failure to identify what else he had to say, any denial of his right of allocution was clearly harmless.  See United States v. Mejia, 953 F.2d 461, 468 (9th Cir. 1991) (denial of right of allocution was harmless because it would not have affected sentence).

The state supreme court's silent denial of Petitioner's judicial bias claim was not contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state

court proceedings. An evidentiary hearing is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations do not provide a basis for habeas relief. <u>Campbell</u>, 18 F.3d at 679. The Court **RECOMMENDS** denial of habeas relief with respect to Claim 3.

**E.      Claim 4 - Motion to Amend Petition - Ineffective Assistance of Appellate Counsel**

Petitioner has filed a Motion to Supplement his Petition to add a claim of ineffective assistance of appellate counsel. (ECF No. 30.) A claim alleging ineffective assistance of appellate counsel was presented to the state supreme court along with Petitioner's other claims. (Lodgment No. 12 at 16.) He contends it was inadvertently omitted from the Petition. (ECF No. 30 at 1-2.) Because the claim did not arise after the Petition was filed, it is not a supplemental claim, and the Court will liberally construe Petitioner's Motion to Supplement the Petition as a Motion to Amend the Petition to add the claim.

Federal Rule of Civil Procedure 15(a) provides that, other than when amendment is available as of right, which does not apply here, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a); <u>see</u> 28 U.S.C. § 2242 (stating that a habeas petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions."). A district court should consider factors such as "bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the party has previously amended his pleadings." <u>Bonin v. Calderon</u>, 59 F.3d 815, 845 (9th Cir. 1995).

Although Petitioner has not previously amended his Petition and there does not appear to be any prejudice to Respondent to add a claim that was presented to the state supreme court along with the other claims which Respondent has already addressed in the Answer, the Court finds amendment would be futile because the claim is without merit. <u>See</u> <u>Bonin</u>, 59 F.3d at 845 ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.") Petitioner alleges that he requested his appellate counsel to include in the direct appeal the claims he has presented here. (Mot. to Amend Pet. [ECF No. 30-1] at 7-15 & Ex. C.) However, the claims presented in the Petition here are lacking in merit for the reasons discussed above.

1   Petitioner has attached a letter from his appellate counsel which states that she refused to raise
2   his ineffective assistance of trial counsel claim because it was not substantiated by the record,
3   and that another attorney in counsel's office had reviewed the record and came to the same
4   conclusion. (Mot. to Amend Pet. Ex. F.)  As set forth above with respect to Claim 1, the state
5   court record supports that determination.  Petitioner has therefore demonstrated neither deficient
6   performance of appellate counsel nor prejudice as a result of appellate counsel's failure to
7   include his claims on direct appeal.  See Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir.
8   1991) (where "trial counsel's performance, although not error-free, did not fall below the
9   Strickland standard[,] . . . petitioner was not prejudiced by appellate counsel's decision not to
10  raise issues that had no merit."); Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982)
11  (stating that an attorney's failure to raise a meritless legal argument does not constitute
12  ineffective assistance); Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980) ("There is
13  no requirement that an attorney appeal issues that are clearly untenable.")  Amending the
14  Petition to include such a claim would therefore be futile.

15         Petitioner also alleges appellate counsel was ineffective for failing to present a claim
16  alleging that his trial transcripts have been altered. (Mot. to Amend Pet. [ECF No. 30-1] at 7.)
17  He alleges here, as he did in the state supreme court (Lodgment No. 13 at 1-2), that he was given
18  two transcripts of his trial, one beginning on page one and one beginning on page nine.
19  (Traverse at 12.)  Respondent has lodged with the Court five volumes of Petitioner's trial
20  transcript. (Lodgment No. 3.)  The first volume includes proceedings on October 28, 2009,
21  during which Petitioner entered his guilty plea to one count of grand theft in violation of
22  California Penal Code section 487(a), and admitted he had suffered a prior conviction which
23  constituted a "strike" under California's Three Strikes law. (Lodgment No. 3, Reporter's Tr.,
24  vol. 1 at 1-5; see also CT 134-39.)  The second proceeding recorded in volume 1 of his trial
25  transcripts is his sentencing on the grand theft conviction, which was held on December 9, 2009.
26  (Lodgment No. 3, Reporter's Tr., vol. 1 at 6-8; see also CT 140.)  Volume 2 of his trial
27  transcripts begins with page 9, and records Petitioner's March 4, 2010, trial on the charge of
28  intentional infliction of corporal injury to a spouse or cohabitant. (Lodgment No. 3, Reporter's

Tr., vol. 2.) It appears clear that Petitioner's trial transcript began with his grand theft conviction and sentencing because one of the sentence enhancement allegations in the criminal complaint upon which the conviction being challenged here was based alleged that he was released from custody on an earlier felony offense when he committed the new offense. (CT 2.) The transcript pages which Petitioner provided to the state supreme court (see Lodgment No. 13), and here are identical in content to the transcripts lodged by Respondent, but include only Petitioner's trial. The transcript Petitioner has used here and in the state court begins on page one, and if the number eight is added to the page number in Petitioner's transcript excerpts, it matches the transcript lodged by Respondent, and there is no irreconcilable conflict between the two.

Petitioner points to numerous instances in his trial transcript, in particular his testimony, which he contends differs from the testimony actually given at trial, due to misprints, additions and omissions. (Mot. to Amend Pet. [ECF No. 30-1] at 7-8 & Ex. D; Traverse Exs. A-K; Lodgment No. 13 Ex. A.) Examples include, but are not limited to, the omission of: (a) White-Holt's admission that she scratched Petitioner's neck and could toss him around if she liked due to his disabilities; (b) Petitioner's reference to White-Holt calling the woman Petitioner spoke to on the trolley a "white bitch," which made it sound as though Petitioner referred to her that way; and (c) Petitioner's testimony regarding where White-Holt placed her knife and telephone on the bed before she grabbed his neck, making it appear they were not as close to her as they were. (Mot. to Amend Pet. Ex. D at 1.) He also contends the transcripts are incorrect in that: (a) Petitioner was afraid that if White-Holt grabbed her knife he was going to kill him, whereas the transcript indicates that he was afraid that if she got up off the ground she would kill him, thus improperly placing her on the ground; (b) the transcript indicates that Petitioner "seen" the skin on his neck peel rather than "feel" it do so; (c) the transcript states he probably hit her three times when another part of the transcript states that he hit her twice, apparently proving the trial transcript must have been altered because he would not have given inconsistent testimony; (d) he answered "yes, I did" when asked if he "kind of blacked out," and testified that "I must have blacked out," but never said he did in fact black out as allegedly reflected in the transcript; and (e) when he is demonstrating how he hit White-Holt, the transcript indicates he says "I have to

hit her like this," indicating the he usually hits her in that manner, when he actually said "I had to hit her like this," indicating that he could not make a fist. (Id. at 1-3.)  There are many similar allegations of supposed alterations, misprints and omissions in the transcripts, and Petitioner's arguments are apparently based either on the divergence of what is written and what Petitioner remembers was said, or on Petitioner's belief that any example of inconsistent testimony or use of imprecise English means there must have been an alteration in the transcripts.  (Id. at 3-8.)

A criminal defendant has a right to a record on appeal which includes a complete transcript of the trial proceedings.  Hardy v. United States, 375 U.S. 277, 279-82 (1964).  Petitioner's contention that he recalls saying or hearing something different than what was recorded in the transcript, or that it is not possible for a witness to give inconsistent testimony or provide ungrammatical answers, does not support a finding of a constitutional violation, as there has been no showing that he was not provided with a fair opportunity to present his claims here and to the state courts, and because he has failed to demonstrate prejudice arising from any alleged alteration or omission.  Id.; see also United States v. Anzalone, 886 F.2d 229, 232 (9th Cir. 1989) ("[A]ssuming there were omissions in the transcripts, appellant cannot prevail without a showing of specific prejudice.")

Accordingly, the Court **RECOMMENDS** that Petitioner's Motion to Amend the Petition be **DENIED**.  Alternately, if the assigned District Judge is inclined to grant Petitioner's Motion to Amend, the Court **RECOMMENDS** that his claim of ineffective assistance of appellate counsel be **DENIED** on the basis that the state supreme court's silent denial of the claim did not involve an objectively unreasonable application of clearly established federal law.

## VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying Petitioner's Motion to Amend the Petition and denying the Petition.

/ / /

1    **IT IS ORDERED** that no later than **January 8, 2014**, any party to this action may file

2    written objections with the Court and serve a copy on all parties.  The document should be

3    captioned "Objections to Report and Recommendation."

4    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

5    Court and served on all parties no later than **January 22, 2014.**  The parties are advised that

6    failure to file objections with the specified time may waive the right to raise those objections on

7    appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez

8    v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

9    DATED:  December 9, 2013

10

11   Jan M. Adler
     U.S. Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-47-                                                                            12cv1003